# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **ORA L. MINK,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:09cv00047 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Ora L. Mink, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Mink protectively filed her current applications for DIB and SSI on March 31, 2006, alleging disability as of January 16, 2006, due to panic disorder, agoraphobia, depression and back pain. (Record, ("R."), at 54-56, 62, 66, 438-40.) The claims were denied initially and upon reconsideration. (R. at 42-43, 44, 45-47, 53, 436.) Mink then requested a hearing before an administrative law judge, ("ALJ"). (R. at 38, 50.) The ALJ held a hearing on November 27, 2007, at which Mink was represented by counsel. (R. at 458-519.)

By decision dated January 4, 2008, the ALJ denied Mink's claims. (R. at 15-27.) The ALJ found that Mink met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2010. (R. at 17.) The ALJ also found that Mink had not engaged in substantial gainful activity since January 16, 2006, the alleged onset date. (R. at 18.) The ALJ determined that the medical evidence established that Mink suffered from severe impairments, namely agoraphobia, anxiety, bilateral carpal tunnel syndrome with compressive median neuropathy and degenerative disc disease, but she found that Mink did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18-22.) The ALJ found that Mink had the residual

functional capacity to perform light work[1] limited by an inability to use her hands for repetitive fine manipulation for more than one-third of the workday, a moderate reduction in her ability to concentrate which limits her to simple, noncomplex tasks and a need to avoid direct contact with the public or work in a setting where there are a large number of people in the work area in close physical proximity. (R. at 22-26.) The ALJ found that Mink was unable to perform any of her past relevant work. (R. at 26.) Based on Mink's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that Mink could perform, including those of an office cleaner, a clerical worker and a laundry sorter/folder. (R. at 26-27.) Thus, the ALJ found that Mink was not under a disability as defined under the Act, and was not eligible for benefits. (R. at 27.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2009).

After the ALJ issued her decision, Mink pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 5-9.) Mink then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2009). The case is before this court on Mink's motion for summary judgment filed November 9, 2009, and the Commissioner's motion for summary judgment filed December 9, 2009.

## *II. Facts*

Mink was born in 1965, (R. at 54), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Mink testified that she graduated from

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2009).

high school and attended college but did not earn a degree. (R. at 462-63.) Mink testified that she has past relevant work as a typesetter and a portrait photographer. (R. at 483-85.)  Mink testified that she has suffered from agoraphobia and anxiety for 14 years. (R. at 477, 501.)  Mink said her symptoms were so severe that she could "barely go out a little bit at a time." (R. at 482.) Mink stated that she suffered from panic attacks twice a month. (R. at 502.)

On her Function Report on April 24, 2006, Mink stated: "The agoraphobia has just paralyzed my life.... Before this hit me, I could drive or go anywhere, stay alone, work – now, just the thought of going out in public will start panic feelings in me. Going to the grocery store is like being thrown into a cage with a wild animal." (R. at 86.) Mink also stated that she had a fear of "just about everything – bathing, driving, leaving the house, sleeping, any public place." (R. at 91.)

Leah Perry Salyers, a vocational expert, also was present and testified at Mink's hearing. (R. at 504-18) Salyers classified Mink's past work as a photo developer and a typesetter as light, semiskilled work. (R. at 506.) She classified Mink's past work as portrait photographer as light and skilled. (R. at 506.) She classified Mink's work as a telephone order clerk as sedentary[2] and semiskilled. (R. at 506.) Salyers was asked to consider an individual of Mink's age, education and background, who had

_____

[2]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2009).

the residual functional capacity to perform light work that did not require use of the hands for fine manipulation for more than one-third of the workday, who could not work around the public or in a setting where there is a large group of people in close physical proximity and who has a moderate reduction in concentration limiting her to simple, noncomplex   tasks. (R. at 509.) Salyer testified that there would be a significant number of jobs available that such an individual could perform, including jobs as an officer cleaner, a document handler, and a laundry sorter. (R. at 509-10.) Salyers stated that, if the same individual would miss more than two days of work a month due to her impairments, there would be no jobs available for her.  (R. at 511.)

In rendering her decision, the ALJ reviewed records from Mendota Medical Center; Gillenwater Chiropractic Center; Wellmont Bristol Regional Medical Center; Healing Hands Health Center; Joseph Crum, D.C.; Bristol Regional Counseling Center; Sapling Grove Rehabilitation; Highlands Ear, Nose & Throat Surgical Group, P.C.; Johnston Memorial Hospital; Dr. William Humphries, M.D.; Internal Medicine & Pediatric Associates of Bristol, P.C.; Davis Family Medicine; Mountain Empire Neurological Associates; Dr. Debra Harman, M.D.; Dr. Carey McKain, M.D.; Dr. Bernand Grunstra, M.D.; Margaret Cress, L.M.F.T.; and Ralph Ramsden, Ph.D. Mink's attorney also submitted additional reports from Margaret Cress to the Appeals Council.[3]

On July 23, 2005, Mink sought emergency treatment at Wellmont Bristol

---

[3]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 4A), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Regional Medical Center for lower right abdominal pain, back pain and anxiety. (R. at 171-72.)

Mink was treated at Gillenwater Chiropractic Center from January 28 to September 6, 2005. (R. at 140-58.) On January 28, 2005, Mink complained of pain in her neck and shoulder area. (R. at 157.) On March 3, 2005, Mink complained of pain in her neck and shoulder area and her lower back radiating into her legs. (R. at 155.) On April 5, 2005, Mink complained of worsening pain in her neck and bilateral shoulder area. (R. at 153.) On June 14, 2005, Mink complained of pain in the right side of her face. (R. at 147.) On August 22, 2005, Mink complained of pain in her neck and bilateral shoulder area and her lower back. (R. at 143.) On each date, manipulation was performed. (R. at 140-58.)

Mink was treated at Healing Hands Health Center, Inc. from August 1, 2005, to April 6, 2006. (R. at 180-88.) On September 14, 2005, Mink complained of anxiety. (R. at 185.) Mink stated that her last full-blown panic attack had occurred two years earlier. (R. at 185.) Mink stated that during these attacks her heart would race and she would sweat. (R. at 185.) Mink stated that she was afraid of getting into a situation where she would have one of these attacks again. (R. at 185.) Mink stated that she was afraid to take Paxil because she had heard that it caused seizures. (R. at 185.) On October 3, 2005, Mink stated that she would like to take Paxil, but she could not swallow pills. (R. at 186.)

On January 16, 2006, Mink returned to Healing Hands Health Center complaining of constant back pain. (R. at 187.) She was given a prescription for

Skelaxin. (R. at 181, 187.) On April 6, 2006, Mink called requesting a prescription for Buspar. (R. at 187.) She stated that Dr. Grunstra had written a prescription for Buspar, but she could not afford it. (R. at 187.) She was instructed to call her mental health counselor. (R. at 188.)

On October 20, 2005, Mink saw Joseph Crum, D.C., a chiropractor, for complaints of a stiff neck and chronic neck and lower back pain. (R. at 195.) Mink returned on February 9, 2006, complaining of pain in her neck and shoulders which was aggravated by sitting, turning her head and sneezing. (R. at 193.) Mink stated that she also suffered from blurred vision, buzzing and ringing in her ears, depression/weeping spells, dizziness, fatigue, heaviness in her head, headaches, loss of balance, low back pain, numbness in her arms and hands, shortness of breath and a stiff neck. (R. at 194.) Crum treated Mink from February 9 to May 3, 2006, with no improvement in her complaints noted. (R. at 190.)

On January 17, 2006, Mink saw Dr. Bernard P. Grunstra, M.D., with Internal Medicine & Pediatric Associates of Bristol, P. C. (R. at 132.) Dr. Grunstra noted that Mink came in complaining of "acute depression again." (R. at 132.) The record does not, however, contain any earlier reports from Dr. Grunstra. The record does contain one brief note from Internal Medicine & Pediatric Associates of Bristol, P. C. stating that Mink was seen on November 25, 2003, and was prescribed Paxil. (R. at 128.) On January 17, 2006, Mink complained that Paxil had made her extremely anxious, nervous and jittery. (R. at 132.) Mink was tearful and told Dr. Grunstra that she had thought of suicide but had no plans. (R. at 132.) Dr. Grunstra prescribed Effexor and Ativan. (R. at 132.) An additional note shows that Lexapro was prescribed for Mink

on January 23, 2006. (R. at 129.)

X-rays of Mink's cervical spine taken at Wellmont Bristol Regional Medical Center on April 28, 2006, showed mild spurring changes at the C5-C6 level associated with reversal of the lordosis and anterior spur formation as well as narrowing of the intervertebral disk space. (R. at 167.)

On May 2, 2006, Mink saw Chelia Hopkins, F.N.P., with Internal Medicine & Pediatric Associates of Bristol, P. C.. (R. at 383-84.) Mink complained of anxiety, dizziness and neck pain. (R. at 384.) Mink also complained of difficulty swallowing and ringing in her ears. (R. at 384.) Hopkins recommended that Mink start taking Zoloft and prescribed physical therapy for her neck pain. (R. at 384.) On September 11, 2006, Hopkins noted that Mink was "very resistant" to medications, and had not taken the Zoloft she had previously prescribed for her. (R. at 382.) Mink stated that she was still agoraphobic. (R. at 382. ) She stated that she felt dizzy, panicky, flighty and short of breath. (R. at 382. ) Mink stated that she had problems being home alone, but would rather use coping skills than medication. (R. at 382.)

Mink also had a CT scan of her pelvis and abdomen performed at Wellmont Bristol Regional Medical Center on May 2, 2006. (R. at 164-65.) The scans were performed because of complaints of right lower quandrant pain. (R. at 164.) No abnormality was noted, and the scans showed no obvious explanation for her complaints of pain. (R. at 165.)

On May 11, 2006, Mink saw Dr. Grunstra for a Physical Therapy Initial

Evaluation. (R. at 275-76.) Mink told Dr. Grunstra that she had suffered from neck and upper back pain for quite some time, which was becoming increasingly worse. (R. at 275.) Mink also complained of lower back pain. (R. at 275.) Mink reported left upper extremity pain with right hand numbness and tingling. (R. at 275.) Mink stated that she was taking Zoloft and hydroxyzine. (R. at 275.) Dr. Grunstra found Mink's range of motion in her lower extremities, upper extremities, neck and trunk all to be within normal limits. (R. at 275.)

Mink attended physical therapy from May 15, 2006, to July 7, 2006. (R. at 259-74.) On June 12, 2006, Dr. Grunstra noted that Mink reported 50 percent improvement in her neck and an 80 percent improvement in her upper back (R. at 268.) On June 20, 2006, Mink reported that her mid-back was doing much better. (R. at 264.) In a July 7, 2006, Discharge Summary, Nancy Hess, a physical therapist, noted that Mink reported significant improvement in her upper back pain, decreased pain in her cervical region and minimal change to her lower back pain and stiffness. (R. at 259.)

On May 24, 2006, Mink saw Dr. Thomas J. Boeve, M.D., of Highlands Ear, Nose & Throat Surgical Group, P.C., for complaints of anxiety, dizziness and choking. (R. at 278-79.) Mink reported that she took Buspar and hydroxyzine. (R. at 278.) Dr. Boeve diagnosed dysphagia, presumably secondary to laryngopharyngeal reflux, dizziness with severe anxiety disorder and mild sensorineural hearing loss. (R. at 279.) Dr. Boeve prescribed Prevacid. (R. at 279.)

On July 11, 2006, Dr. William Humphries, M.D., performed an evaluation of Mink at the state agency's request. (R. at 282-86.) Mink told Humphries that she had

suffered from constant pain in her neck and intermittent low back for at least 20 years. (R. at 282.) She stated that she had treated with a chiropractor. (R. at 282.) Mink told Dr. Humphries that she took Zoloft, Buspar and Prevacid. (R. at 283.) Dr. Humphries noted that Mink was in no distress, related well and was cooperative for her exam. (R. at 283.) Dr. Humphries found Mink's neck range of motion to be moderately reduced with moderate tenderness on palpation of the entire paraspinous musculature of the cervical spine and the medial trapezius muscles bilaterally. (R. at 283.) Dr. Humphries found Mink's back range of motion only mildly reduced with no paravertebral muscle spasm. (R. at 283.) He did find tenderness to palpation of the paraspinous musculature to a moderate degree in the thoracic region and moderately severe in the lumbar region bilaterally. (R. at 283.) Straight leg raise was negative to 90 degrees sitting bilaterally. (R. at 283.)

Dr. Humphries found Mink's joint range of motion of the upper extremities to be full without tenderness, heat, swelling or deformity, except for slightly reduced range of motion in both shoulders due to pain in the cervical spine region. (R. at 283.) Dr. Humphries found Mink's joint range of motion of the lower extremities to be full, except for some back pain on extreme hip motion. (R. at 283.) Dr. Humphries found Mink's grip, radial, median and ulnar nerve function were intact bilaterally. (R. at 284.) Dr. Humphries found no reflex, motor or sensory loss in any of Mink's extremities. (R. at 284.) Dr. Humphries also found Mink to be alert and oriented. (R. at 284.) Her speech was intelligible and sustained. (R. at 284.) Her behavior was appropriate for the exam, and her thought and idea content were within normal limits. (R. at 284.) Mink's memory was intact for recent and remote events, and her intelligence was within normal limits. (R. at 284.)

Dr. Humphries diagnosed Mink as suffering from chronic cervical strain and chronic lumbar strain. (R. at 284.) Dr. Humphries stated that Mink would be limited to sitting, standing and walking for six hours in an eight-hour workday and to lifting items weighing 50 pounds occasionally and 25 pounds frequently. (R. at 284.) Dr. Humphries also stated that Mink should avoid working around heights or hazards. (R. at 285.)

An x-ray of Mink's lumbar spine taken on July 11, 2006, showed degenerative changes in the lumbar spine. (R. at 281.)

On July 19, 2006, Dr. Donald Williams, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment for Mink. (R. at 287-93.) Dr. Williams stated that Mink could frequently lift and carry objects weighing up to 25 pounds. (R. at 288.) He stated that Mink could occasionally lift and carry objects weighing up to 50 pounds. (R. at 288.) Dr. Williams stated that Mink could sit and stand and/or walk for a total of about six hours in an eight-hour day. (R. at 288.) Dr. Williams opined that Mink also should avoid concentrated exposure to hazards such as machinery or heights. (R. at 290.)

On July 19, 2006, Eugenie Hamilton, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique Form, ("PRTF"), for Mink. (R. at 294-306.) Hamilton stated that Mink suffered from depression and panic disorder, which were not severe impairments. (R. at 294, 297, 299.) Hamilton stated that Mink's impairments caused mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 304.) She stated that Mink's

impairments caused no restrictions of activities of daily living and had resulted in no repeated episodes of decompensation. (R. at 304.)

On September 6, 2006, Mink saw Dr. Debra L. Harman, M.D., for a physical. (R. at 365-68.) Mink complained of weakness, ringing in her ears, blurry vision, hot flashes and paresthesias. (R. at 365.) Mink stated that she would get shaky out of the blue and was fatigued a good part of the time. (R. at 365.) Mink also complained of problems swallowing. (R. at 365.) Mink stated that she had suffered from neck pain radiating into her arms for the past year. (R. at 366.) Mink also complained of lightheadedness and dizziness with trouble walking. (R. at 366.) Mink stated that she was afraid of going out alone and was nervous, sad and depressed most of the time. (R. at 366.) Mink told Dr. Harman she was "homebound" due to anxiety seven years previously and again from January to March of 2006. (R. at 367.)

On September 11, 2006, chest x-rays of Mink were taken at Wellmont Bristol Regional Medical Center. (R. at 163.) These x-rays showed no acute cardiopulmonary disease. (R. at 163.)

On September 13, 2006, Chelia Hopkins, F.N.P., wrote that she originally saw Mink in April of 2006. (R. at 422.) Hopkins stated that Mink complained of agoraphobia, which developed a few months earlier. (R. at 422.) Prior to that, Mink told her that she led a normal life and was able to work. (R. at 422.) Mink stated that her agoraphobia was so bad that she had a difficult time leaving her house. (R. at 422.) Mink stated that when she left her house, she had panic attacks during which she became dizzy, short of breath, panicky and experienced a flighty feeling. (R. at 422.)

Hopkins stated, "It is my professional opinion that Ms. Mink has true agoraphobia." (R. at 422.)

On September 13, 2006, Dr. Harman completed a Physical Therapy Initial Evaluation for Sapling Grove Rehab. (R. at 257-58.) Mink complained of pain and spasms in her lower cervical area and upper thoracic area. (R. at 257.) Mink also reported numbness in her index, middle and ring fingers bilaterally. (R. at 257.) Mink stated that she took hydroxyzine, Prevacid and a muscle relaxer. (R. at 257.)

On September 29, 2006, a carotid duplex ultrasound study was performed on Mink at Wellmont Bristol Regional Medical Center. (R. at 160.) The study showed bilateral minimal stenosis without ulceration. (R. at 160.)

Mink received physical therapy from September 14, 2006, to November 7, 2006. (R. at 243-56.) On November 7, 2006, Mink reported no change in her condition with only short-term relief of symptoms after physical therapy. (R. at 243.)

Nerve conduction studies performed by Dr. Douglas Williams, M.D., on October 9, 2006, showed that Mink suffers from bilateral carpal tunnel syndrome. (R. at 311-13.) Ultrasounds of each wrist performed on the same day were consistent with carpal tunnel syndrome, according to Dr. Williams. (R. at 310.)

Mink treated with Margaret Cress, L.M.F.T., from January 19, 2006, to November 13, 2007. (R. at 198-242, 385-418.) Upon her initial session, Mink complained of increased depression and anxiety with panic attacks. (R. at 242.) Mink told Cress that she had problems with dizziness and breaking out in a sweat at work.

(R. at 242.) Mink stated that Dr. Grunstra had prescribed Effexor after a reaction to Paxil. (R. at 242.) Cress diagnosed Mink as suffering from panic disorder with agoraphia and a dependent personality disorder. (R. at 238.) Cress placed Mink's Global Assessment of Functioning[4], ("GAF"), score at 60.[5]  (R. at 238.)

On January 24, 2006, Mink told Cress that she had discontinued the Effexor and was starting Lexapro and Ativan. (R. at 235.) On February 7, 2006, Mink presented to Cress "very nervous." (R. at 234.) Mink stated that she lost her job. (R. at 234.) She also stated that she could not tolerate taking Lexapro. (R. at 234.) Mink told Cress that she could not stand to be by herself. (R. at 234.) On February 23, 2006, Mink presented tearful and very anxious. (R. at 232.) Mink stated that she was concerned that her parents would soon be traveling to Alabama and she would not be able to go with them and also would not be able to stay home by herself. (R. at 232.)

On March 20, 2006, Mink saw Dr. Ashvin A. Patel, M.D., a psychiatrist. (R. at 230-31.) Dr. Patel noted that Mink complained that none of the medications she had tried had helped her symptoms. (R. at 230.) Dr. Patel also noted that Mink had not used any of the medications for more than a few days. (R. at 230.)  Mink stated that she started having panic attacks six months after her youngest child was born 13 years earlier. (R. at 230.) Mink stated that her ex-husband had given her some Xanax and that had seemed to help her. (R. at 230.) She also reported taking Ativan. (R. at 230.)

---

[4]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[5]A GAF of 51-60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

Dr. Patel noted that Mink appeared to be in no active physical distress. (R. at 230.) Dr. Patel diagnosed Mink as suffering from panic disorder with agoraphobia, mild to moderate, and depressive disorder, secondary to panic disorder. (R. at 231.) Dr. Patel prescribed Lexapro and Risperdal. (R. at 231.)

On April 3, 2006, Mink told Cress that she was not taking her medication. (R. at 229.) On April 21, 2006, Mink returned to see Dr. Patel and told him that she never started the Lexapro or Risperdal. (R. at 227.) Mink agreed to try to take Zoloft. (R. at 227.) On April 25, 2006, Mink told Cress that she feels that her mother and her ex-husband are her "safe people." (R. at 226.) On May 30, 2006, Cress noted some progress in that Mink was able to set goals for herself by defining what she did not want to do. (R. at 207.)

On June 13, 2006, Mink reported decreased panic attack, but increased shaking and anxiety. (R. at 205.) Cress stated that she reinforced Mink's need to get out and not isolate herself from others. (R. at 205.) On June 20, 2006, Mink discussed her history of sexual abuse by her ex-husband. (R. at 204.) Mink stated that she tried to tolerate the abuse as long as she could for the sake of her parents and children. (R. at 204.) Cress noted the need to consider a diagnosis of post-traumatic stress disorder. (R. at 204.) On June 27, 2006, Mink reported that she continued to improve and was getting out more. (R. at 203.) She stated that she was driving her ex-husband's van for a month in lieu of child support and that having a reliable vehicle to drive resulted in less anxiety. (R. at 203.)

Dr. Steve J. Herrin, M.D., a psychiatrist, saw Mink on July 11, 2006. (R. at 201-02.) Dr. Herrin noted that Mink was very anxious about medication and did not even

try the Risperdal recently prescribed for her. (R. at 201.) She also said that she only took Zoloft for two or three days before stopping it. (R. at 201.) Mink asked if she could have Librium or Xanax, admitting that she had taken these from someone else's prescription in the past. (R. at 201.) Dr. Herrin noted that he discussed with Mink her unrealistic fear of medication which had resulted in chronic noncompliance with medication trials. (R. at 201.) Dr. Herrin noted that Mink's dress and grooming were appropriate. (R. at 201.) Mink was able to maintain logical, relevant conversation. (R. at 201.) Dr. Herrin described Mink's mood as anxious with congruent affect. (R. at 201.) Dr. Herrin noted that Mink suffered from an anxiety disorder with agoraphobia and panic complicated by dysthymia. (R. at 201.) Dr. Herrin recommended that Mink try an even lower dose of Zoloft. (R. at 201.) Dr. Herrin stated that Mink's prognosis was guarded due to her long history of noncompliance and disabling anxiety. (R. at 201-02.)

On July 18, 2006, Mink told Cress that she had gotten out daily the week before. (R. at 199.) On August 8, 2006, Mink reported progress in being able to drive up to 22 minutes from her home. (R. at 222.) On August 15, 2006, Mink told Cress that her father had brought her and had intended to run an errand while she was in therapy. (R. at 221.) Mink said that she wanted to shorten her therapy session because her father was irritated that she did not want him to leave while she was there. (R. at 221.) Mink said that she did not want her father to "leave me all alone in there [with] no way out." (R. at 221.) On August 22, 2006, Mink expressed anxiety that she would be working with her parents food vending business at the Bristol raceway the rest of the week. (R. at 220.) At first Mink said that she would be "trapped" at the racetrack, but then acknowledged that she was staying there because she wanted to stay. (R. at 220.) On August 29, 2006, Mink told Cress that she had done well the previous week

at the racetrack. (R. at 219.) Mink said she had coped well and felt good about herself as a result. (R. at 219.) Cress noted that Mink was experiencing reduced anxiety and depression. (R. at 219.)

On September 5, 2006, Cress noted that Mink reported feeling less anxious. (R. at 218.) Cress noted that there had been some improvement in Mink's condition with therapy, but stated that Mink still would not attend therapy without one of her parents being present in the waiting room or car. (R. at 218.) Mink reported problems sleeping. (R. at 218.) She said that she had stayed overnight at her parents' house for most of the summer. (R. at 218.) On September 12, 2006, Cress noted that Mink continued to show improvement in getting out, driving and being around others. (R. at 217.) Mink told Cress that she dreaded upcoming events that would take her parents away from home. (R. at 217.) On September 19, 2006, Mink stated that she was willing to start walking several hundred feet from her parents' home and to daily increase the distance. (R. at 216.) Mink also stated that she was willing for her parents to leave for brief periods while she was in her therapy sessions. (R. at 216.) On September 26, 2006, Mink discussed possibly attending a local church. (R. at 215.) Mink stated that she had recently traveled with her parents to a Civil War reenactment and how she had used her coping skills. (R. at 215.)

On October 3, 2006, Mink stated that her anxiety continued to decrease. (R. at 214.) On October 17, 2006, Mink stated that she planned to go out with someone she had recently met. (R. at 212.) On October 31, 2006, Mink noted continued improvement, although she stated that she still did not go out by herself and did not want to drive. (R. at 211.) Mink said that she mostly went out with her parents, but was mostly staying in her own apartment. (R. at 211.) On November 14, 2006, Mink

stated that she continued to improve and noted that she had been able to attend the funeral of her ex-husband's grandmother recently. (R. at 209.)

On November 21, 2006, Mink discussed with Cress feeling free from her ex-husband. (R. at 418.) Cress stated that Mink was "likely at the end of grieving this relationship." (R. at 418.) Cress stated that Mink separated herself from her ex-husband well. (R. at 418.) On December 19, 2006, Mink stated that she had been having a "bad time" and that she felt as if she was "going backwards." (R. at 417.) Cress noted that Mink was tearful at times. (R. at 417.) On January 2, 2007, Mink discussed anger toward her grandfather and how he had distributed his assets to various family members. (R. at 416.) Cress counseled Mink that her desire to change others and get involved in what she could not change only increased her anxiety. (R. at 416.) Mink reported some increased depression over the recent holidays. (R. at 416.)

On November 28, 2006, Mink told Dr. Harman she was suffering from sleep apnea.(R. at 362.) On December 27, 2006, Mink complained of dizziness and low back pain. (R. at 360.) On January 26, 2007, Mink returned complaining of breathing problems, sleep problems and low back pain. (R. at 358.)

Julie Jennings, Ph.D., a state agency psychologist, completed a PRTF for Mink on December 11, 2006. (R. at 321-34.) Jennings stated that Mink suffered from depression and panic disorder, which did not meet the listing requirements. (R. at 324, 326.) Jennings stated that Mink's impairments caused mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 331.) She stated that Mink's impairments caused no restrictions of activities of daily living

and had resulted in no repeated episodes of decompensation. (R. at 331.) On reconsideration, Jennings stated that Mink was capable of performing nonstressful work that did not involve frequent contact with the public. (R. at 334.)

Jennings also completed a Mental Residual Functional Capacity Assessment for Mink on December 11, 2006. (R. at 335-36.) Jennings stated that Mink had a moderately limited ability to understand, remember and carry out detailed job instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public and to set realistic goals or make plans independently of others. (R. at 335-36.) Jennings stated that Mink was not significantly limited in her ability to remember locations and work-like procedures, to understand, remember and carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions and to travel in unfamiliar places or use public transportation. (R. at 335-36.)

On that same date, Dr. Frank M. Johnson, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on Mink (R. at 314-20.) Dr. Johnson stated that Mink could frequently lift and carry objects weighing up to 25 pounds. (R. at 315.)  He stated that Mink could occasionally lift and carry objects weighing up to 50 pounds. (R. at 315.) Dr. Johnson stated that Mink could sit and stand and/or walk for a total of about six hours in an eight-hour day. (R. at 315.) Dr. Johnson said that Mink also should avoid concentrated exposure to hazards such as machinery or heights. (R. at 317.)

On January 9, 2007, Mink reported to Cress that she planned to start dating again. (R. at 415.) Cress noted that Mink was dysphoric and discouraged. (R. at 415.) On January 16, 2007, Mink stated that she was feeling depressed. (R. at 414.) Mink also expressed anxiety about medical testing and surgery for carpal tunnel syndrome. (R. at 414.) Mink discussed how she felt out of control in these situations and how it increased her anxiety. (R. at 414.)  Cress referred Mink to a coping skills group in addition to her regular therapy. (R. at 414.) On January 23, 2007, Mink stated that she had dreams of traveling and getting away from her mother, feeling some safety in others, but stated she was not ready to act on those feelings. (R. at 413.)

Mink saw Dr. Harman on January 26, 2007, complaining of trouble breathing, not sleeping at all and low back pain. (R. at 358-59.)  Mink stated that she felt like her throat was closing up on her. (R. at 358.) Dr. Harman recommended a sleep study and physical therapy for her back pain. (R. at 358-59.) Dr. Harman also noted that Mink had not taken the Zoloft previously prescribed for her.  (R. at 358.)

On February 6, 2007, Mink reported to Cress that she had a panic attack at 5:45

a.m. that morning. (R. at 412.) Mink reported that she did not know what brought on the attack, although she did state that her grandfather had recently died. (R. at 412.) Mink reported that she was able to use her coping skills to calm herself down. (R. at 412.) Mink reported that she was beginning to dread having to start work again with her family food vendor business. (R. at 412.) Mink told Cress that she does feel better when she gets out and is around people not in her family. (R. at 412.) On February 13, 2007, Mink stated that she had noticed a decrease in her anxiety. (R. at 411.) Mink stated that she would like to do some volunteer work, but she did not think she could work consistently because she could not regularly deal with people. (R. at 411.)

Mink began attending a Women's Coping Skill Group on February 13, 2007. (R. at 410.) During this group session, Mink shared that her agoraphobia was so bad at times she was unable to leave her bedroom. (R. at 410.) On February 20, 2007, Mink reported improvement in her condition. (R. at 409.)

On February 14, 2007, Mink was seen by Dr. Carey W. McKain, M.D., for a bilateral hand problem of about two years' duration. (R. at 380-81.) Mink complained of numbness and pain in her hands, dropping objects and discomfort with sustained activity. (R. at 380.) Dr. McKain stated that Mink had no true radicular pain in her arms. (R. at 380.) On exam, Dr. McKain found localized pain to the neck on percussion. (R. at 380.) Mink's reflexes were normal at all levels, and there were no motor deficits. (R. at 380.) Dr. McKain stated that there were bilateral carpal tunnel signs upon percussion which were painful. (R. at 380.) Mink had full range of motion throughout all her joints with no sign of swelling. (R. at 380.) Her circulation was normal, but her grip strength was decreased on the right side. (R. at 380.) Dr. McKain reviewed nerve conduction studies which he stated were consistent with median nerve

neuropathy at the wrist. (R. at 380.) Mink told Dr. McKain that she would like to have the neuropathy surgically repaired. (R. at 381.) Dr. McKain scheduled her for surgery. (R. at 381.)

On February 21, 2007, Mink told Dr. Harman that she had made amazing improvements. (R. at 355.) Mink stated that she had returned to driving and had been able to visit a grocery store without using a shopping cart recently. (R. at 355.)

On March 5, 2007, Ralph Ramsden, Ph.D., a licensed clinical psychologist, performed an evaluation of Mink at the request of her attorney. (R. at 423-32.) Ramsden noted that Mink's mother accompanied her to the evaluation. (R. at 423.) Ramsden also noted that Mink was "quite anxious." (R. at 423.) Ramsden stated that Mink had no difficulty comprehending information presented to her either in writing or verbally and expressed herself clearly. (R. at 423.) He stated that Mink appeared to have average or above intellectual capabilities. (R. at 423.) Mink was oriented to time, place and person, and she was alert and responsive. (R. at 423.) Ramsden noted that Mink was "clearly agitated and anxious" throughout his evaluation. (R. at 428.)

Ramsden administered the Miller Forensic Assessment of Symptoms Test, ("M-FAST"), and the Minnesota Multiphasic Personality Inventory - Second Edition, ("MMPI-2"). (R. at 427.) Ramsden stated that the M-FAST is a brief interview measure of the potential for clinical malingering of psychological symptoms. (R. at 427-28.) Ramsden stated that Mink's score was below the cut-off for probable malingering. (R. at 428.) Ramsden questioned the validity of Mink's MMPI-2 results, stating that they showed either possible psychotic thought processes, exaggeration of symptoms or a "cry for help." (R. at 428.) Ramsden noted that the results showed that

Mink felt quite uncomfortable around people and avoided group activities and crowds. (R. at 428.)

Mink stated that her sleep habits had improved in recent months to the point where she could sleep up to seven hours a night. (R. at 425.) Mink stated that she quit her most recent job after three months due to anxiety. (R. at 425.) Mink said that when she was employed she cried daily and felt like everything was closing in on her. (R. at 425.) Mink told Ramsden that she had been having panic attacks since April of 1993. (R. at 426.) Mink described the need to have a "safe person." (R. at 426.) When she was married, that person was her husband; since her divorce, that person has been her mother. (R. at 426.) Mink stated that her anxiety was focused on "being alone." (R. at 426.) She stated that she suffered from panic attacks at least four times a week and that each attack lasted from 20 to 60 minutes. (R. at 426.) She stated that during these attacks she experienced dizziness, hot flashes, shortness of breath and feeling off balance, weak, shaky and disoriented. (R. at 426.)

Mink also complained of suffering from depression for the past 10 years. (R. at 427.) She also admitted a history of suicidal ideations with no attempt. (R. at 427.) Mink described feeling hopeless, worthless and without any energy. (R. at 427.) Mink also reported a problem with her short-term memory.(R. at 427.) Ramsden diagnosed Mink as suffering from panic disorder with agoraphobia, dysthymic disorder, post-traumatic stress disorder and dependent personality disorder. (R. at 429.) He placed Mink's then-current GAF score at 35.[6] (R. at 429.)

---

[6]A GAF of 31 to 40 indicates "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. ..." DSM-IV at 32.

Ramsden completed an Assessment Of Ability To Do Work-Related Activities (Mental) for Mink on March 18, 2007. (R. at 430-32.) Ramsden stated that Mink had no useful ability to deal with the public, to use judgment, to deal with work stresses, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 430-31.) Ramsden stated that Mink's abilities to relate to co-workers, to function independently and to understand, remember and carry out complex jobs were seriously limited. (R. at 430-31.) He stated that Mink's abilities to follow work rules, to interact with supervisors, to maintain attention and concentration, to understand, remember and carry out detailed, but not complex, job instructions and to maintain personal appearance were limited, but satisfactory. (R. at 430-31.) Ramsden stated that Mink had a more than satisfactory ability to understand, remember and carry out simple job instructions. (R. at 431.) Ramsden stated that Mink's impairments, on average, would cause her to be absent from work more than two days a month. (R. at 432.)

On March 13, 2007, Mink told Cress that she was stressed from a dispute with her 14-year-old daughter the day before. (R. at 405.) Mink stated that her daughter refused to go to school and the situation became "chaotic." (R. at 405.) Mink also described a situation in which her daughter and a friend disobeyed her instruction to stop using a computer recently. (R. at 405.) When Cress asked why Mink did not simply unplug the computer so her daughter could not use it, Mink replied that she did not want to get up because she was "warm in bed." (R. at 405.) On March 20, 2007, Mink was tearful over he daughter's decision to live with her father, Mink's ex-husband. (R. at 404.) Cress noted that Mink was using "extreme thinking," such as Mink's statement that her daughter was in "Satan's hands," referring to her ex-husband. (R. at 404.) On March 27, 2007, Mink was much improved over the week

before. (R. at 403.) She stated that she was less depressed and had enjoyed a weekend trip with her parents. (R. at 403.) She told Cress that she enjoyed getting out with others. (R. at 403.)

On April 2, 2007, Mink returned to Dr. Harman complaining of high blood pressure. (R. at 352.) Dr. Harman recommended a low-salt diet. (R. at 352.) On April 20, 2007, Mink returned to Dr. Harman complaining of headache. (R. at 350.) Dr. Harman diagnosed a toothache and recommended that Mink see a dentist. (R. at 350.)

On April 3, 2007, Mink told Cress that she was continuing to improve from the adjustment of her daughter going to live with her ex-husband. (R. at 401.) Mink stated that she did feel that she had little purpose or enjoyment in life. (R. at 401.) On April 10, 2007, Mink told Cress that she had "chickened out" of carpal tunnel surgery. (R. at 400.) On April 17, 2007, Mink stated that she had reverted to sleeping at he parents' house. (R. at 399.)

On April 24, 2007, Mink stated that she had met someone online and was proceeding slowly with that relationship. (R. at 398.) On May 8, 2007, Mink noted that she had felt anxiety on a recent trip, but had overcome it through her cognitive therapy skills. (R. at 397.) On June 5, 2007, Mink noted that she was continuing to get out more. (R. at 394.) In fact, she stated that she planned to sell fudge weekly at the local Farmers' Market. (R. at 394.) On July 3, 2007, Mink expressed anger and frustration at her ex-husband over a continuing dispute over child support. (R. at 392.) Mink also was grieving the death of an uncle. (R. at 392.) On July 17, 2007, Mink expressed frustration with her mother because her mother does not pay her for her work with her parents in their food vending business. (R. at 391.)

On May 2, 2007, Mink returned to Dr. Harman complaining of headaches that she believed were caused by her neck problems. (R. at 348.) Dr. Harman recommended physical therapy for neck and back pain relief and strengthening. (R. at 348.) On May 18, 2007, Mink asked to be prescribed a muscle relaxer and stated that she assumed Dr. Harman would not prescribe Lortab for her back pain. (R. at 346.) On June 15, 2007, Mink returned seeking a written prescription for a TENS unit. (R. at 344.) Mink stated that the use of a TENS unit had helped. (R. at 344.) She also stated that her physical therapist was "killing" her. (R. at 344.) On August 28, 2007, Mink asked Dr. Harman for a prescription for Xanax, saying that someone had given her some and it had helped her. (R. at 340.) Dr. Harman counseled Mink on the fact that Xanax could be addictive. (R. at 340.) Dr. Harman prescribed Buspar. (R. at 341.)

On October 2, 2007, Mink told Cress that her daughter had returned home and that this forced her to be more of an adult. (R. at 387.) Mink requested to see a psychiatrist, but this request was denied because of Mink's refusal to take medication. (R. at 387.) Mink also stated that she had resumed driving, although she stated that she did not get out of the car. (R. at 387.)

On October 2, 2007, Cress completed an Assessment Of Ability To Do Work-Related Activities (Mental). (R. at 419-21.) Cress stated that Mink's abilities were satisfactory in all areas except for a seriously limited ability to relate with co-workers, to interact with supervisors, to behave in an emotionally stable manner and to demonstrate reliability. (R. at 419-20.) Cress stated, Mink "is a talented, creative, organized person. She is intelligent and can perform well on her jobs." (R. at 420.) She also stated, "Lynn's issue is being away from the safety of her mother, even though her mother is not emotionally supportive." (R. at 420.) Cress stated, "She is

passive when it comes to advocating for herself, allows others to mistreat her and has a self sabotaging pattern to her life." (R. at 421.) Cress stated, on average, Mink's impairments would cause her to miss more than two days a month from work. (R. at 421.) She stated, however, that this could improve with time if Mink did not "sabotage." (R. at 421.)

On October 8, 2007, Mink returned to Dr. Harman complaining of dizziness. (R. at 338-39.) Mink claimed her dizziness impacted her relationships with family and friends, restricted her travel, affected her social activity, interfered with her household activities and made it difficult to walk unassisted. (R. at 339.) Dr. Harman's treatment note does not contain any diagnosis or treatment for Mink's complaints.

On November 6, 2007, Cress noted that Mink was nervous during their session because Mink's father left to run an errand. (R. at 386.) Cress noted that Mink had "self soothed" as the session progressed. (R. at 386.) Mink also expressed frustration at her mother's attempts to keep Mink dependent on her. (R. at 386.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the

Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2009); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated January 4, 2008, the ALJ denied Mink's claims. (R. at 15-27.) The ALJ determined that the medical evidence established that Mink suffered from severe impairments, namely agoraphobia, anxiety, bilateral carpal tunnel syndrome with compressive median neuropathy and degenerative disc disease, but she found that Mink did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18-22.) The ALJ found that Mink had the residual functional capacity to perform light work limited by an inability to use her hands for repetitive fine manipulation for more than one-third of the workday, a moderate reduction in her ability to concentrate which limits her to simple, noncomplex tasks and a need to avoid direct contact with the public or work in a setting where there are a large number of people in the work

area in close physical proximity. (R. at 22-26.) The ALJ found that Mink was unable to perform any of her past relevant work. (R. at 26.) Based on Mink's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed that Mink could perform. (R. at 26-27.) Thus, the ALJ found that Mink was not under a disability as defined under the Act, and was not eligible for benefits. (R. at 27.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

Mink argues that the ALJ did not properly assess her mental residual functional capacity. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 10-13.) Mink also argues that the ALJ's decision as to her mental residual functional capacity does not contain a rationale sufficient to determine whether substantial evidence exists to support it. (Plaintiff's Brief at 13-15.) Mink further argues that substantial evidence does not support the ALJ's finding that she is not disabled as a result of her mental impairments. (Plaintiff's Brief at 15-20.)

The ALJ found that Mink suffered from the mental impairments of agoraphobia and anxiety, which she found were severe. The ALJ found that these mental impairments resulted in only a moderate reduction in Mink's ability to concentrate which limited her to simple, noncomplex tasks and a need to avoid direct contact with the public or work in a setting where there are a large number of people in the work area in close physical proximity. Based on my review of the record, I find that substantial evidence does not support the ALJ's finding as to Mink's mental residual functional capacity. In particular, I find that the ALJ improperly rejected the evidence that Mink's mental impairments would result in her being absent from work for more than two days each month.

Every mental health expert who expressed an opinion on the matter opined that Mink's impairments would affect her ability to attend work. State agency psychologist Jennings stated that Mink was moderately limited in her ability to complete a normal workday and workweek. (R. at 335-36.) Psychologist Ramsden stated that Mink had no useful ability to demonstrate reliability. (R. at 431.) Ramsden also specifically found that Mink's impairments would cause her to be absent from work more than two days a month. (R. at 432.) Therapist Cress stated that Mink had a seriously limited ability to demonstrate reliability. (R. at 419-20.) Cress also stated that Mink's impairments would cause her to miss more than two days of work a month. (R. at 421.)

In her opinion, the ALJ stated that she was specifically rejecting Ramsden's opinions and giving greater weight to those of Cress because of her long-standing treatment relationship with Mink. (R. at 25.) Nevertheless, the ALJ stated that she also was rejecting Cress's conclusion that Mink's mental impairment would affect her work attendance. (R. at 25.) While an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if she sufficiently explains her rationale and if the record supports her findings, an ALJ may not reject medical evidence for no reason or for the wrong reason. *See King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980). Furthermore, an ALJ may not simply disregard uncontradicted expert opinions in favor of her own opinion on a subject that she is not qualified to render. *See Young v. Bowen*, 858 F.2d 951, 956 (4th Cir. 1988); *Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir.1984). In this case, there is no expert mental health opinion that Mink's mental impairment would not affect her reliability or her work attendance. In the absence of such evidence, the ALJ's finding that Mink's mental impairment

would not affect her reliability or work attendance is improper. Therefore, I find that substantial evidence does not exist to support this finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist to support the Commissioner's finding as to Mink's mental residual functional capacity; and
2. Substantial evidence does not exist to support the Commissioner's finding that Mink was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Mink's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the decision of the Commissioner denying benefits and remand Mink's claims to the Commissioner.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2009):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     April 1, 2010.

/s/    *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE